UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------X
DAVID ULRICH,                                              :
                                                           :
                Plaintiff,                      :
                                                           :
      -against-                                         :   COMPLAINT AND
                                                           :   <u>JURY DEMAND</u>
JOHN O'KEEFE,                                              :
                                                           :   22 Civ. _____
                Defendant.                       :
------------------------------------------------------------X

Plaintiff David Ulrich, by his attorneys, Kraus & Zuchlewski LLP, as and for his Complaint, alleges as follows:

## INTRODUCTION

1. Plaintiff David Ulrich, an information technology professional and former President/Executive Vice President for Operations and Chief Operations Officer of ITelagen LLC, brings this action for breach of fiduciary duty against his former business partner Chief Executive Officer ("CEO") John O'Keefe for breaching his fiduciary duties of candor and loyalty to Mr. Ulrich. Mr. O'Keefe failed to provide Mr. Ulrich with critical information regarding ITelagen's acquisition by private equity company Sheridan and failed to exercise his duty of loyalty to Mr. Ulrich by not representing his interests in critical negotiations with the acquiring entity both before and after the transaction's closing.

2. Specifically, when Sheridan terminated the employment of Mr. Ulrich and Mr. O'Keefe, Sheridan offered Mr. Ulrich a minimal severance package that provides him with scant transitional assistance until he obtains his next position. Based upon communications from Mr. O'Keefe, Mr. Ulrich understands that Mr. O'Keefe has received payments from Sheridan in

excess of $350,000. Mr. O'Keefe has failed and refused to remedy this breach of his fiduciary duty to Mr. Ulrich.

## JURISDICTION AND VENUE

3. The Court has diversity jurisdiction over this matter pursuant to 28 U.S.C. § 1332 because the parties are of diverse citizenship and the amount in controversy exceeds $75,000.

4. Venue is proper in this Court because Mr. Ulrich is domiciled within this judicial district and a majority of the events related to Mr. Ulrich's claims occurred within this district.

## THE PARTIES

5. Mr. Ulrich is a United States citizen domiciled in New York, New York. He is a citizen of the state of New York.

6. Mr. O'Keefe Was the former CEO of ITelagen LLC. Upon information and belief, he is domiciled in Sarasota, Florida.

## FACTS

### Introduction

7. In early 2006, Mr. Ulrich met with Mr. O'Keefe, then CEO of NetGenIT, regarding an employment opportunity with that start-up company. The company initially hired Mr. Ulrich as Sales Agent. Later that year, he received a grant of 300,000 shares of NetGenIT common stock.

8. Mr. Ulrich began his career at NetGenIT with a focus on technology support. His role quickly evolved to focus on the health care platform the company was developing as well as oversight of all aspects of the business.

9. Mr. Ulrich excelled at his work; in 2008 Mr. O'Keefe promoted him to the position of Chief Operating Officer and granted him 18% of the company stock.

10. In or about 2018, Mr. O'Keefe again promoted Mr. Ulrich to the position of Executive Vice President.

11. From that point on, Mr. Ulrich and Mr. O'Keefe were partners. When describing ITelagen's growth, Mr. O'Keefe routinely used the expression "when David and I started the company", and he often referred to Mr. Ulrich as his partner in social and professional settings. Mr. Ulrich and Mr. O'Keefe would sign documents as "Director" and "Managing Director," respectively. The two jointly made major decisions involving the company.

## ITelgen's Search for an Investor

12. In approximately 2015, Mr. O'Keefe began searching for a new investor who would be more willing to give ITelagen opportunities to grow than the company's prior main investor.

13. After an extensive search, ITelagen identified GBP Capital ("GBP") as a new investor. At the time, GBP appeared to be a legitimate, mainstream business.

14. It later became apparent that GBP was a questionable, borderline enterprise, Mr. Ulrich and Mr. O'Keefe began comparing it to a pyramid scheme.

15. For these and other reasons, Mr. O'Keefe and Mr. Ulrich decided that it was imperative to replace GBP with another investor.

16. Mr. O'Keefe and the company's Chief Financial Officer Jeremy Kirchner conducted the search for a new investor. Sheridan expressed interest in replacing GBP.

17. After discussions between the two companies, ITelagen and Sheridan reached a tentative agreement whereby Sheridan would purchase ITelagen outright.

18. Shortly before the acquisition deal was to close, the parties learned that law enforcement officials were about to take action against GBP's three principals.

19. Sheridan then decided, presumably because of unease regarding ITelagen's association with a suspect enterprise, that it was withdrawing from the transaction with ITelagen.

20. Nonetheless, Mr. O'Keefe continued negotiating with Sheridan in an effort to persuade it that the ITelagen transaction was viable. He argued that the acquisition should not be aborted because of its association with GBP, and Sheridan should move forward with consummating the deal.

21. During the course of negotiations, days before closing, Mr. O'Keefe informed Mr. Ulrich and Richard Bandoy, one of the company's founding partners, that a substantial amount of his capital would be invested in the new company, as required by Sheridan. Therefore, Mr. O'Keefe proposed receiving a fee from the proceeds of the transaction. Mr. Ulrich and Mr. Bandoy did not object.

22. Mr. O'Keefe never disclosed whether he received a fee or the amount of any fee he may have received.

23. Mr. O'Keefe's efforts were ultimately successful and an agreement between ITelagen and Sheridan was reached. The transaction closed March 26, 2021.

## The Deal's Aftermath

24. Mr. O'Keefe initially advised Mr. Ulrich and the entire executive team that Sheridan intended to keep ITelagen and its management staff intact and use the company – at least short term – as a platform for future investments in healthcare information technology prospects.

25. Mr. O'Keefe informed Mr. Ulrich that he, but not Mr. Ulrich, would be given an employment contract with Sheridan.

26. This development concerned and surprised Mr. Ulrich, who had assumed that his partner Mr. O'Keefe, who had been conducting the Sheridan negotiations, would continue to look after his interests as he believed Mr. O'Keefe had done in the past. Throughout their association, Mr. O'Keefe had played the role of negotiator, and Mr. Ulrich had focused on operational needs growing the company's products and revenue. Mr. Ulrich reasonably relied on Mr. O'Keefe to fulfill his fiduciary duties.

27. After the closing, Mr. Ulrich learned that Mr. O'Keefe that Sheridan had required him to agree to a severance package as a condition for final closing of the deal.

28. Mr. O'Keefe neither disclosed the terms of his severance arrangement to Mr. Ulrich nor did he seek to obtain a similar severance arrangement for Mr. Ulrich.

29. Two weeks after the closing, on April 7, Sheridan's senior managers advised Mr. O'Keefe that his employment as well as Mr. Ulrich's employment was to be terminated. Mr. Ulrich received an email from several Sheridan principals offering him three months of severance and six months of healthcare.

30. Soon thereafter, post-termination discussions with Sheridan involving the details of Mr. O'Keefe's and Mr. Ulrich's dismissals took place.

31. During his negotiations with Sheridan, Mr. O'Keefe did not inform Mr. Ulrich of the progress or content of the discussions.

32. Upon information and belief, Sheridan promised Mr. O'Keefe a severance arrangement of a three month paid transaction, at least one year of severance and continuing health care coverage.

33. By contrast, Mr. Ulrich's arrangement was identical to the one offered to ITelagen's recently hired Sales Manager, who not only had failed to close any sales but also reportedly had harassed one of the company's female employees.

34. Mr. Ulrich, disturbed by Mr. O'Keefe's failure to advance or effectively represent his interests in his discussions with Sheridan, declined to sign a separation agreement.

35. Perhaps uneasy about his failure to act in the best interests of Mr. Ulrich, Mr. O'Keefe offered him a $50,000 payment in exchange for signing the separation package proposed to him by Sheridan.

36. Mr. Ulrich, viewing this offer as an inducement to accept a grossly inadequate separation deal absolving Mr. O'Keefe of any liability, did not accept the offer.

## Conclusion

37. Because Mr. Ulrich was Mr. O'Keefe's business partner a fiduciary relationship existed between the two men.

38. Their fiduciary relationship involved not only a special trust between Mr. Ulrich and Mr. O'Keefe, but also Mr. O'Keefe's obligation to act with the best intentions with regard to Mr. Ulrich.

39. Mr. Ulrich relied on Mr. O'Keefe, as the fiduciary in which he had placed his trust, to demonstrate the utmost good faith and undivided loyalty in representing Mr. Ulrich's interests in his negotiations with Sheridan.

40. Mr. O'Keefe breached his duty of care, duty of candor and particularly his duty of loyalty to Mr. Ulrich by failing to act in his best interests in connection with the terms of their becoming employed by Sheridan and their separation from Sheridan.

41. As a result, Mr. Ulrich has suffered significant financial injury as well as harm to his career and professional reputation.

## AS AND FOR A CAUSE OF ACTION

### Breach of Fiduciary Duty

42. Mr. Ulrich repeats and realleges each and every allegation contained in paragraphs 1 through 43 inclusive as though fully set forth herein.

43. Mr. O'Keefe owed a fiduciary duty to Mr. Ulrich, his business partner based on the relationship between the parties as well as agreements between them.

44. As such, Mr. O'Keefe was required to be completely honest, forthcoming and truthful to Mr. Ulrich and to act in good faith and in his best interests.

45. Mr. O'Keefe breached his fiduciary duty to Mr. Ulrich by both failing to provide him with timely and accurate information about Sheridan's acquisition of ITelagen and by placing his own interests above Mr. Ulrich's by negotiating a favorable separation arrangement for himself while making little or no effort to ensure an adequate separation agreement for Mr. Ulrich.

46. As a direct result of Mr. O'Keefe's failure to disclose all pertinent information regarding the Sheridan acquisition and the negotiations preceding it to Mr. Ulrich, and to act in accord with his best interests in making agreements with Sheridan, Mr. Ulrich suffered damages both financially and to his professional stature.

### JURY DEMAND

Mr. Ulrich demands a trial by jury on all counts.

**WHEREFORE,** Mr. Ulrich respectfully prays that this Court:

47. Issue a judgment declaring that Mr. O'Keefe's actions violated Mr. Ulrich's rights under the fiduciary duty doctrine.

48. Ordering that Mr. O'Keefe pay Mr. Ulrich:

      a.      A sum commensurate with the damages he suffered as a result of Mr. O'Keefe's breach of his fiduciary obligations;

      b.      Other and further relief as may be just and proper.

Dated: New York, New York
       January 26, 2023

                                       KRAUS & ZUCHLEWSKI LLP
                                       Attorneys for Plaintiff
                                       99 Park Avenue, Suite 1510
                                       New York, New York 10016

                      By:     */s/ Pearl Zuchlewski*
                                       Pearl Zuchlewski (PZ2926)