UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED:   8/12/2025
```

DAVID ULRICH,

                              Plaintiff,

              -against-

JOHN O'KEEFE,

                              Defendant.

23-cv-686 (MKV)

FINDINGS OF FACT AND
CONCLUSIONS OF LAW
AFTER BENCH TRIAL OF
CLAIM AND COUNTERCLAIM

MARY KAY VYSKOCIL, United States District Judge:

David Ulrich initiated this case against John O'Keefe, alleging that O'Keefe had breached a fiduciary duty to Ulrich in connection with the respective severance offers the parties received when they were both terminated from their former business after that business was acquired by another company. Ulrich sought damages reflecting the amount of severance that Ulrich believed he should have been offered. O'Keefe thereafter filed a counterclaim alleging that by bringing this case Ulrich breached a release of claims agreement. O'Keefe sought damages in the form of the attorney's fees and costs he has incurred to defend himself. The Court held a bench trial. For the reasons set forth below, the Court concludes that Ulrich failed to prove his claim against O'Keefe for breach of fiduciary duty, and O'Keefe failed to prove his counterclaim against Ulrich for breach of the release of claims.

## I.     PROCEDURAL HISTORY

Ulrich initially commenced an action against O'Keefe in January 2022, and the case was assigned to another judge in this District. *See Ulrich v. O'Keefe*, No. 22-cv-170 (PKC) at ECF No. 1. However, Ulrich voluntarily dismissed the case "without prejudice." *Id.* at ECF No. 15. One year later, Ulrich attempted to file a complaint against O'Keefe, but the Clerk's Office issued a deficiency notice, and the Chief Judge administratively closed the case with instructions that it

could be "reopen[ed] and randomly reassign[ed]" within 60 days. *Ulrich v. O'Keefe*, 2023 23-cv-320 (LTS) at ECF No. 5.

The next day, Ulrich commenced this action with another deficient complaint [ECF No. 1]. Thereafter, he properly filed his original complaint [ECF No. 6]. O'Keefe responded with a pre-motion letter seeking leave to file a motion to dismiss [ECF No. 9]. The Court issued an order granting O'Keefe leave to file a motion to dismiss and granting Ulrich leave to amend in advance of any such motion [ECF No. 10].

Ulrich thereafter filed the Amended Complaint [ECF No. 14 ("FAC")]. The Amended Complaint alleges that Ulrich and O'Keefe "were partners" in a Delaware business, ITelagen LLC ("ITelagen"). FAC ¶ 11. The Amended Complaint alleges that, throughout their partnership, "O'Keefe had played the role of negotiator" in business transactions, while "Ulrich had focused on operational needs," and that O'Keefe had "look[ed] after [Ulrich's] interests . . . in the past." FAC ¶ 33. It further alleges that, while Ulrich and O'Keefe were "partner[s]," ITelagen was acquired by the "private equity company Sheridan." FAC ¶ 1. The Amended Complaint alleges that, although O'Keefe had "advised" Ulrich that "Sheridan intended to keep ITelagen and its management staff intact" for a period of time, both Ulrich and O'Keefe were terminated "[t]wo weeks after the [March 26, 2021] closing, on April 7, [2021]." FAC ¶¶ 31, 36. The gravamen of Ulrich's claim is that, according to the Amended Complaint, O'Keefe had secretly negotiated a favorable "severance package" for himself and had failed to "seek . . . a similar severance arrangement" for Ulrich. FAC ¶¶ 34, 35.

The Amended Complaint also alleges that, in order to facilitate the Sheridan acquisition, the members of ITelagen, including Ulrich and O'Keefe, sold their ownership interests to Acquiescent Holdings, LLC ("Acquiescent") pursuant to a Redemption Agreement [ECF Nos. 14-

1, 14-2 (collectively, the "Redemption Agreement")]. *See* FAC ¶¶ 24, 25. In the Redemption Agreement, the sellers (the members of ITelagen) released all claims against Acquiescent and "its managers, officers and members . . . arising out of" the sale to Acquiescent and the Redemption Agreement "up to and including the date of the Closing." Redemption Agreement § 4(c). O'Keefe was the "Managing Member" of Acquiescent. FAC ¶ 25. According to the Amended Complaint, Sheridan then acquired Acquiescent, which thereafter ceased to exist. *See* FAC ¶ 29.

O'Keefe moved to dismiss the Amended Complaint [ECF Nos. 15, 16 ("Def. Mem."), 17, 19]. O'Keefe argued that he and Ulrich were not in a fiduciary relationship when O'Keefe received a more favorable severance package from Sheridan than Ulrich was offered. *See* Def. Mem. at 6–7. Specifically, O'Keefe argued that he did not know his employment would be terminated on April 7, 2021, and, in any event, "[f]ollowing the Redemption Agreement, Plaintiff and Defendant were nothing more than coworkers." Def. Mem. at 6, 7. O'Keefe further argued that, insofar as Ulrich sought to assert a claim against O'Keefe based on conduct that occurred "prior to the Redemption Agreement," any such claim was barred by the release of claims in the Redemption Agreement. Def. Mem. at 8.

The Court denied the motion to dismiss, stressing that it was required to accept as true the factual allegations in the Amended Complaint and draw all reasonable inferences in Ulrich's favor [ECF No. 20 ("Op.") at 1 n.1, 4, 5, 7]. The Court noted that there was a question of fact about the "specific time period" during which O'Keefe allegedly "betrayed" Ulrich. Op. at 4; *see id.* at 7. The Court explained that, on a motion to dismiss, it was required to accept Ulrich's allegations that O'Keefe secretly negotiated a superior severance package for himself during a period when O'Keefe was the CEO of ITelagen and "Ulrich was a member," and that "O'Keefe 'referred to' Ulrich 'as his partner'" in the business, giving rise to an inference in Ulrich's favor, at the pleading

3

stage, that Ulrich and O'Keefe were in a fiduciary relationship. Op. at 5–6 (citing and quoting FAC ¶¶ 1, 11, 25). The Court also ruled that, in part because of questions about the alleged timeline of alleged events in the Amended Complaint, the release of claims in the Redemption Agreement did not "unambiguously preclude" this lawsuit. Op. at 7.

After the Court denied the motion to dismiss, O'Keefe filed an Answer and Counterclaim [ECF No. 21 ("Ans.")]. O'Keefe's pleading alleges that Ulrich breached the release of claims in the Redemption Agreement by filing this lawsuit and seeks damages in the form of "attorney's fees and costs . . . arising from" the litigation. Ans. at 7. Ulrich filed an answer to O'Keefe's Counterclaim [ECF No. 24].

The parties thereafter commenced discovery [ECF No. 31]. The parties also stipulated to a bench trial [ECF No. 35]. During the discovery period, the Court twice ordered the parties to avail themselves of alternative dispute resolution procedures [ECF Nos. 56, 62], but the parties were unable to reach a consensual resolution of this matter.

On July 22, 2025, the Court presided over a bench trial [ECF No. 85-1 ("Tr.")]. Pursuant to the Court's Individual Rules of Practice, both sides submitted the direct testimony of any witnesses to the Court by affidavit. *See* Tr. at 3:22–24, 68:16. Each party submitted only his own affidavit for witness testimony.

During the plaintiff's case, the defense cross-examined Ulrich and offered eight documentary exhibits into evidence, all of which were received without objection. *See* Tr. at 4–47; DX1 (the "Redemption Agreement"); DX2; DX7; DX8; DX10; DX14; DX18; DX20. Plaintiff's counsel conducted a brief redirect and offered one exhibit, which was received without

objection.  *See* Tr. at 47–54; PX15.  After the conclusion of the redirect examination, Ulrich rested his case.  *See* Tr. at 55:5.

The defense then moved "to dismiss the plaintiff's case-in-chief for breach of fiduciary duty."  Tr. at 58:8–9.  Defense counsel argued that, under the Redemption Agreement, Ulrich had released any claims against O'Keefe up to the date of "his sale of shares of Acquiescent" on March 26, 2021.  Tr. at 55:24–25.  Defense counsel further argued that, after that date, Ulrich and O'Keefe were merely employees of ITelagen who were not in any fiduciary relationship with each other. *See* Tr. at 55:17–20.  Finally, citing Ulrich's own testimony that he had not asked O'Keefe "to negotiate a severance agreement for him" and that Ulrich had been offered severance agreement, which he rejected, defense counsel argued "there can be no claim for breach of fiduciary duty," and "plaintiff has failed to mitigate his damages."  Tr. at 56:10–25.

In response to the defense motion, counsel for Plaintiff argued that the "release agreement" applies "only to what occurred up to and including the time of the closing" on March 26, 2021, and Ulrich's claim is that the alleged breach of fiduciary duty occurred "between the time of the closing, March 26th, and the date that Mr. Ulrich was told his employment ended on April 7."  Tr. at 57:3–7.  Indeed, Plaintiff's counsel expressly represented that "the relevant time frame . . . is March 26th, after the closing, to April 7th."  Tr. at 57:17–18.  Plaintiff's counsel also conceded that during that period Ulrich and O'Keefe "were both employees."  Tr. at 59:14–15.  Plaintiff's counsel argued that O'Keefe nevertheless owed Ulrich a fiduciary duty because Ulrich had "relied upon Mr. O'Keefe to protect his interests."  Tr. at 59:23–24.

After a brief recess, the Court construed the defense motion as a motion for judgment in O'Keefe's favor on Ulrich's claim for breach of fiduciary duty under Rule 52 of the Federal Rules of Civil Procedure and granted the motion.  *See* Tr. at 61–67; Fed. R. Civ. P. 52(c).  For reasons

explained more fully below, the Court concluded that Ulrich had failed to prove the existence of a fiduciary duty, failed to prove a breach, and failed to prove damages. *See* Tr. at 61–67.

The Court thereafter turned to the trial of O'Keefe's counterclaim for breach of the release of claims in the Redemption Agreement. The defense relied on the affidavit containing O'Keefe's direct testimony and the pleadings and evidence already in the record before the Court, including the Redemption Agreement. Tr. at 71:10–72:19. The Court ruled, without objection, that it would permit the defense to supplement the record on damages, to reflect the updated "time records" of defense counsel, and give plaintiff's counsel an opportunity to respond, in the event that the Court were to find that O'Keefe prevailed on his counterclaim. Tr. at 71:6–14, 72:20–23. Plaintiff's counsel declined to cross-examine O'Keefe, and, as such, he did not testify live. *See* Tr. at 72:1–2. The defense rested, and the Court advised the parties that it would issue a written decision both memorializing its ruling at trial granting judgment in favor of O'Keefe on Ulrich's claim and resolving O'Keefe's counterclaim against Ulrich.

## II.    FINDINGS OF FACT

The Court makes the following findings of fact pursuant to Rule 52(a)(1) of the Federal Rules of Civil Procedure ("Findings of Fact"). The Court's Findings of Fact reflect the contents of, and the Court's assessments of the credibility and weight of, the direct testimony of the parties submitted in the form of affidavits, Ulrich's testimony at the trial, and the parties' trial exhibits. *See Diesel Props S.r.l. v. Greystone Bus. Credit II LLC*, 631 F.3d 42, 52 (2d Cir. 2011). The Court notes that, on cross-examination, defense counsel elicited admissions from Ulrich that, at several points, Ulrich had given incorrect testimony, both in his affidavit and on the stand at trial, about the corporate structure of the business for which he worked, changes thereto, and his own position in relation to the business at various times. *See* Tr. at 24:17–21, 27:6–9, 28:13–15, 33:22–34:7.

In light of those admissions and based on the Court's own observations at the trial, the does not credit certain portions of Ulrich's testimony.

## A. O'Keefe Founded NetGenIT and Later Gave Ulrich a Minority Share.

In or about 2005, John O'Keefe founded a business, "NetGenIT," which was "a solo venture" that aimed "to provide information technology support services to small and medium-sized businesses." O'Keefe Aff. ¶ 1; *see* Ulrich Aff. ¶¶ 1–2; Tr. at 23:8–11. In or about 2006, O'Keefe hired David Ulrich to work for NetGenIT "in a commission-only sales role." O'Keefe Aff. ¶ 1; *see* Ulrich Aff. ¶ 3; Tr. at 43:3. Later in 2006, Ulrich "received a grant" of shares in NetGenIT from O'Keefe. Ulrich Aff. ¶ 4; *see* O'Keefe Aff. ¶ 4; DX 7; Tr. at 23:16–17, 24:23–24. Specifically, at that point, "O'Keefe owned about three and a half times the amount of the company that [Ulrich] owned[.]" Tr. at 25:1–3.

When asked on cross-examination why O'Keefe owned so much more of NetGenIT than Ulrich did, Ulrich testified: "When he presented me the option or the opportunity to become a shareholder, he said, This is what I'm offering you – and I accepted it – which was 20 percent." Tr. at 25:5–7; *see also* O'Keefe Aff. ¶ 5.

## B. NetGenIT Rebranded as ITelagen, and Ulrich Was Promoted.

In or about 2008, having shifted the focus of the business to "healthcare IT," the company "rebrand[ed] as ITelagen LLC." O'Keefe Aff. ¶ 6; *see also* Tr. at 27:17–20; DX8.[1] In or about the same time, "O'Keefe promoted [Ulrich] to Chief Operating Officer," and Ulrich "began to receive a salary rather than commissions." Ulrich Aff. ¶ 6.

"At that time," O'Keefe also "referred to [Ulrich] as his partner." Ulrich Aff. ¶ 8; *see id.* ¶ 7; *see also* O'Keefe Aff. ¶ 10 (O'Keefe attesting that "after 2015" he and Ulrich "were not

---

[1] ITelagen LLC was a subsidiary of NetGenIT, Inc. *See* Tr. at 27:8–9; DX 8.

business partners").

**C.    The Organization and Ownership of the Business Changed.**

"In 2011, [ITelagen LLC] reorganized . . . . via an 'Action by Written Consent of the Controlling Interest Shareholders.'"  O'Keefe Aff. ¶ 7; *see* DX2 (the "Action by Written Consent").  As pertinent here, the corporate parent entity NetGenIT changed its name to Acquiescent Holdings, Inc.  *See* O'Keefe Aff. ¶ 7; Tr. at 35:4–6; Action by Written Consent at 1.  Pursuant to the Action by Written Consent, O'Keefe held "6,000 shares of common stock" in Acquiescent, Holdings, Inc., and Ulrich held "300 common and 1,500 restricted shares."  O'Keefe Aff. ¶ 7; *see* Action by Written Consent at 1–2; *cf.* Ulrich Aff. ¶ 11.

The 2011 reorganization was undertaken "to facilitate mezzanine debt financing" from a company called "Marion [sic] Partners" in 2012.  O'Keefe Aff. ¶ 8; *cf.* Ulrich Aff. ¶ 16; Tr. at 33:17–20.  At some point thereafter, Acquiescent, Holdings, Inc. became Acquiescent, Holdings LLC (hereinafter, "Acquiescent").  *Compare* DX2, *with* DX1.

In or about 2015, a company called GPB IT Holdings ("GPB") "acquired 80% of ITelagen through a transaction in which Acquiescent retained the remaining 20% of ITelagen."  O'Keefe Aff. ¶ 9; *see* Tr. at 20:5–7; *see also* Ulrich Aff. ¶ 20.

Ulrich testified that, at some point, he received "$600,000," but he did "not remember what that was in consideration for."  Tr. at 33:22–25.

Thereafter, following these various changes, O'Keefe and Ulrich were employees of ITelagen, with O'Keefe serving as CEO, and Ulrich serving "in sales and account management *not* executive leadership."  O'Keefe Aff. ¶¶ 9–12 (emphasis in original); *see* DX10; *see also* DX14; Tr. at 9:6–10:4.  At this point, both parties had "ceased holding direct equity interests in ITelagen."  O'Keefe Aff. ¶ 9; *see also* Ulrich Aff. ¶ 17.  Rather, O'Keefe and Ulrich both held (unequal)

membership interests in Acquiescent, which, in turn, held "the 20% minority stake of ITelagen not sold to GPB." O'Keefe Aff. ¶ 10; *see* Redemption Agreement, Schedule A; O'Keefe Aff. ¶¶ 7, 9.

Ulrich repeatedly testified on cross-examination that "Acquiescent is [the only] company in which" Ulrich "claim[s]" he was "a partner with Mr. O'Keefe" during the time period relevant to his claim. Tr. at 13:1–3; *see id.* at 18–9:1 (Ulrich confirming that he was "a partner with Mr. O'Keefe" in "[o]ne entity," "Acquiescent"); *see also id.* at 20:12–14; 30:24–31:5.

At some point after the GBP transaction, an effort commenced to sell ITelagen to Sheridan Capital Partners ("Sheridan"). *See* O'Keefe Aff. ¶ 13; Ulrich Aff. ¶ 21. Meanwhile, as of August 2020, Ulrich was employed by ITelagen as "Operations Coordinator," not an officer or director, and had a yearly salary of $100,000 per year. DX 14; *see* Tr. at 14:6.

### D. Ulrich Sold his Interest in Acquiescent and Was Later Terminated by ITelagen.

On March 26, 2021, ITelagen was sold entirely to Sheridan. O'Keefe Aff. ¶ 16; *see* Ulrich Aff. ¶¶ 24, 27; Tr. at 36:13–22. In connection with the sale of ITelagen to Sheridan, Ulrich, O'Keefe, and the other members of Acquiescent sold their membership shares to Acquiescent pursuant to a Redemption Agreement dated March 26, 2021. *See* O'Keefe Aff. ¶ 16; Ulrich Aff. ¶ 24; Tr. at 29:18–24; DX1 ("Redemption Agreement").

The Redemption Agreement contained a release of claims, stating that the sellers agreed to "forever discharge" Acquiescent and its "members from and against all claims which the Releasors

ever had . . . or may have in the future arising out of any matter, thing, or event occurring up to and including the date of Closing . . . ." Redemption Agreement § 4(c).

As Ulrich admitted on cross-examination, "after March 26, 2021," Ulrich did not, "in any way, shape, or form, have any kind of partnership interest with John O'Keefe in any entity." Tr. at 30:20–23.

After the March 26, 2021 closing with Sheridan, Ulrich remained employed by ITelagen for approximately two weeks. *See* Tr. at 52:22–53:2 (Ulrich testifying that during "the time period of March 26, 2021 through April 7, 2021" he "was an employee of ITelagen"); *see also* Ulrich Aff. ¶¶ 27, 32.

On April 7, 2021, Ulrich learned that he was being terminated. *See* Ulrich Aff. ¶ 32; Tr. at 37:12–14. ITelagen offered Ulrich a severance agreement that provided "three months of [salary] and six months of healthcare." Ulrich Aff. ¶ 33; *see* Tr. at 39:9–14; DX18; DX20. Ulrich sought to negotiate a better offer for himself, but the company "refused to negotiate." Ulrich Aff. ¶ 34. Ulrich did not accept the severance offer. Ulrich Aff. ¶ 34; Tr. at 40:6–8

As Ulrich admitted on cross-examination, he never asked O'Keefe to negotiate a severance agreement for him. Tr. at 11:4–6. O'Keefe "was not involved in Ulrich's severance negotiations" and "was not consulted by Sheridan in advance" about "the terms of any termination," including his own. O'Keefe Aff. ¶¶ 18, 23, 24.

O'Keefe also was terminated "without warning" on April 7, 2021. O'Keefe Aff. ¶ 17; *see* Tr. at 39:15–16. ITelagen offered O'Keefe a severance agreement that "provided for 12 months' base salary, COBRA reimbursement, and pro-rated bonuses." O'Keefe Aff. ¶ 18. O'Keefe accepted that severance offer. O'Keefe Aff. ¶ 18.

### III.    CONCLUSIONS OF LAW

The parties stipulate that "[t]his mater is governed by Delaware law" [ECF No. 69-1 at 7]. Under Delaware law, for both a claim of breach of fiduciary duty and a breach of contract claim, a plaintiff is required to prove his case, including damages, by a preponderance of the evidence. *See In re TransCare Corp.*, 81 F.4th 37, 56 (2d Cir. 2023); *Raviv v. Mirror Biologics, Inc.*, 2024 WL 2798870, at *16 (S.D.N.Y. May 31, 2024).

**A.  Ulrich Failed To Prove his Claim for Breach of Fiduciary Duty.**

"To establish liability for the breach of a fiduciary duty, a plaintiff must demonstrate that the defendant owed [him] a fiduciary duty and that the defendant breached it." *Est. of Eller v. Bartron*, 31 A.3d 895, 897 (Del. 2011).  Under Delaware law, "[g]enerally, a fiduciary relationship is a situation where one person reposes special trust in another or where a special duty exists on the part of one person to protect the interests of another." *Wal-Mart Stores, Inc. v. AIG Life Ins. Co.*, 901 A.2d 106, 113 (Del. 2006) (brackets altered) (internal quotation marks and citation omitted).  However, one person cannot unilaterally create a fiduciary relationship by placing his trust in another.  *See id.* at 113–14; *McMahon v. New Castle Assocs.*, 532 A.2d 601, 604 (Del. Ch. 1987).  Indeed, the Supreme Court of Delaware has stressed that even while "normal business dealings . . . can sometimes take on certain aspects of a fiduciary relationship," nevertheless, "it is vitally important that the exacting standards of fiduciary duties not be extended to quotidian commercial relationships." *Wal-Mart Stores, Inc.*, 901 A.2d at 114.

In general, under Delaware law, general partners and joint venturers owe each other fiduciary duties. *See Dohmen v. Goodman*, 234 A.3d 1161, 1167 (Del. 2020); *J. Leo Johnson, Inc. v. Carmer*, 38 Del. Ch. 579, 584, 156 A.2d 499, 502 (1959)).  In addition, "managers of a Delaware limited liability company owe traditional fiduciary duties of loyalty and care to the members of

the LLC." *William Penn P'ship v. Saliba*, 13 A.3d 749, 756 (Del. 2011). However, crucially to this case, "Delaware law does not impose fiduciary dut[ies] on '[co-]employees.'" *In re World Health Alternatives, Inc.*, 385 B.R. 576, 591 (Bankr. D. Del. 2008); *see also Riblet Prods. Corp. v. Nagy*, 683 A.2d 37, 40 (Del. 1996) (holding that directors did not owe any fiduciary duties to employee as stockholder for purposes of exercising termination right).

At the conclusion of his case, Ulrich had failed to prove that O'Keefe owed him a fiduciary duty during the timeframe relevant to Urich's claim. In particular, Ulrich, through his counsel, expressly and repeatedly represented at the trial that "the relevant time frame" for Ulrich's claim was after "March 26th [2021], *after* the closing, to April 7th." Tr. at 57:1718 (emphasis added); *see id.* at 57:5–8 ("What we're contending is that what happened after March 26th forms the basis of the complaint."), 58:5–6, 58:22–25. As Ulrich admitted on cross-examination, "after March 26, 2021," Ulrich did not, "in any way, shape, or form, have any kind of partnership interest with John O'Keefe in any entity." Tr. at 30:20–23. Thus, Ulrich cannot rely on a partnership with O'Keefe as the source of any purported fiduciary duty during the relevant timeframe. *See Touch of Italy Salumeria & Pasticceria, LLC v. Bascio*, 2014 WL 108895, at *7 (Del. Ch. Jan. 13, 2014) ("no [fiduciary] duties exist once the fiduciary relationship has ended").

In denying O'Keefe's motion to dismiss, the Court explained that there were questions of fact about the relevant timeframe in this case but, at the pleading stage, the Court was required to accept Ulrich's allegations that O'Keefe's alleged betrayal of Ulrich occurred when "O'Keefe was a manager" and "Ulrich was a member" of the relevant LLC. Op. at 5–7. At trial, Ulrich testified repeatedly on cross-examination that Acquiescent was "the only entity" in which Ulrich "had an ownership interest with John O'Keefe" during the timeframe relevant to his claim. Tr. at 30:24–31:5; *see id.* at 8:18–9:1, 13:1–3, 20:12–14. The evidence admitted at trial establishes that, prior

to March 26, 2021, O'Keefe was the managing member of Acquiescent, and Ulrich was a member. *See* Redemption Agreement.  However, on March 26, 2021, Ulrich sold his entire membership interest in Acquiescent.  *See* Tr. at 30:12–23; Redemption Agreement.  As such, Ulrich cannot rely on his membership in Acquiescent as a source of any fiduciary duty.  *See Touch of Italy Salumeria & Pasticceria, LLC*, 2014 WL 108895, at *7.

     In contrast with the allegations in the Complaint, the evidence at trial clearly established that Ulrich was not O'Keefe's partner in ITelagen, or any other entity, nor was Ulrich a member of Acquiescent, or any other relevant entity, during the timeframe relevant to his claim.  *See* Tr. at 30:12–23.  Rather, as Ulrich testified and his counsel affirmed, Ulrich was merely an employee of ITelagen when O'Keefe allegedly failed to negotiate a favorable severance agreement for Ulrich. *See* Tr. at 9:24–10:7 (Ulrich testifying on cross-examination that he was "an employee of ITelagen . . . . [a]t the time of the transaction for which [Ulrich] assert[s] that [he is] entitled to money from John O'Keefe"); *id.* at 52:22–53:2 (Ulrich testifying on redirect that "[b]etween March 26th of 2021 and April 7 of 2021" Ulrich "was an employee of ITelagen"); *id.* at 59:12–15; DX14. Furthermore, the evidence at trial showed that O'Keefe, too, was an employee of ITelagen when he allegedly failed to negotiate a favorable severance agreement for Ulrich.  *See* O'Keefe Aff. ¶¶ 9; Tr. at 18:21–23; DX10.  Indeed, Plaintiff's counsel conceded that "during the period March 26 though April 7" O'Keefe and Ulrich "were both employees." Tr. at 59:12–15.  This concession is devastating for Ulrich's claim because "Delaware law does not impose fiduciary dut[ies] on '[co-]employees.'"  *In re World Health Alternatives, Inc.*, 385 B.R. at 591; *see also Riblet Prods. Corp.*, 683 A.2d at 40.

     In light of the evidence, and the concession by Plaintiff's counsel, that the parties were both merely employees during precisely the timeframe that Plaintiff's counsel had identified as the

relevant timeframe for Plaintiff's claim, the Court specifically asked Plaintiff's counsel to identify "the source of a fiduciary duty." Tr. at 59:17. Plaintiff's counsel responded only that "throughout [their] relationship . . . Mr. Ulrich consistently relied upon Mr. O'Keefe to protect his interests." Tr. at 59:19–24. However, the Court finds, Ulrich fell far short of proving that he had a legally cognizable "*expectation* . . . of special trust" in O'Keefe. *McMahon*, 532 A.2d at 605 (emphasis added) (internal quotation marks omitted).

The sum total of the evidence that Ulrich produced in this regard can be found in two paragraphs of his own direct testimony by affidavit. *See* Ulrich Aff. ¶¶ 23, 30. Specifically, Ulrich first asserts that he had "relied upon and trusted O'Keefe to protect . . . [Ulrich's] interests" in connection with the acquisition of ITelagen by Sheridan "based upon O'Keefe's prior conduct publicly recognizing [Ulrich] as a partner, increasing [his] equity and assigning [him] corporate [*i.e.*, executive] roles." Ulrich Aff. ¶ 23. Second, Ulrich asserts that he "had assumed that [his] partner O'Keefe would continue to look after [Ulrich's] interest as [Ulrich] believed O'Keefe had done in the past." Ulrich Aff. ¶ 30. On cross-examination, when asked why he believed "O'Keefe had an obligation to negotiate a severance for [Ulrich,]" who had already admitted he never asked O'Keefe to do so, Ulrich testified that, in general, over the course of their relationship, O'Keefe had "managed and took care of the mechanics of" corporate "dealings," whereas Ulrich focused only on "operations." Tr. at 11:16–20.

Ulrich's broad assertions about his perception of the general contours of his relationship with O'Keefe over the course of the business dealings are obviously insufficient to prove, by a preponderance of the evidence, that Ulrich had a legally cognizable "special trust" relationship with O'Keefe during the relevant period. *McMahon*, 532 A.2d at 605. Ulrich's first piece of testimony by affidavit invokes O'Keefe's "prior" recognition of Ulrich as a "partner," Ulrich's

equity in ITelagen, and Ulrich role as an executive.  Ulrich Aff. ¶ 23.  However, as set forth in the Court's Findings of Fact, the parties' business relationship, the organization and ownership of the business, and Ulrich's role all changed long before ITelagen was sold to Sheridan.  *See supra* at 7–9.  Although O'Keefe "referred to [Ulrich] as his partner" in or about 2008, Ulrich Aff. ¶ 8, O'Keefe attests that they were no longer partners after the 2015 GPB transaction, O'Keefe Aff. ¶ 10.  Other evidence supports O'Keefe's testimony, since as Ulrich admitted, Ulrich ceased holding any equity in ITelagen in 2015, and he was paid $600,000 amidst these changes.  *See* Tr. at 12:19–25, 20:5–11, 33:22–25; O'Keefe Aff. ¶¶ 9, 10; *see also* Ulrich Aff. ¶ 17.  In all events, Ulrich admitted that he and O'Keefe were *not* partners in any business when O'Keefe allegedly failed to negotiate a severance package for Ulrich in 2021.  *See* Tr. at 30:20–23.  Furthermore, as of 2020, well before his termination, Ulrich was employed by ITelagen in a non-executive role.  DX 14; *see* O'Keefe Aff. ¶ 12.  Thus, even if the Court were to conclude that Ulrich's "prior" business relationship with O'Keefe "[took] on certain aspects of a fiduciary relationship," the Court finds that any such relationship had clearly ended well before the alleged breach.  Ulrich Aff. ¶ 23; *Wal-Mart Stores, Inc.*, 901 A.2d at 114; *see Touch of Italy Salumeria & Pasticceria, LLC*, 2014 WL 108895, at *7.

Ulrich's second, purely conclusory, bit of testimony by affidavit that he had "assumed" O'Keefe would "look after" his interests does nothing to advance his claim.  Ulrich Aff. ¶ 30.  Indeed, at the close of his case, Ulrich had failed to offer into evidence a single example from his prior course of dealings with O'Keefe to support an "expectation" that O'Keefe would negotiate Ulrich's severance when both parties were employees of ITelagen. *McMahon*, 532 A.2d at 605; *see Wal-Mart Stores, Inc.*, 901 A.2d at 114; *In re World Health Alternatives, Inc.*, 385 B.R. at 591.  On cross-examination, Ulrich admitted that he did not ask O'Keefe to negotiate a severance

15

agreement for him.  *See* Tr. at 11:3–6.  When asked directly why he believed O'Keefe had an

obligation to do so, Ulrich did not testify that O'Keefe had ever negotiated any contract for Ulrich

personally.  Rather, Ulrich answered only that, in general, over the course of their relationship,

O'Keefe had "managed and took care of the mechanics of" corporate "dealings," whereas Ulrich

focused only on "operations."  Tr. at 11:16–20.

The Supreme Court of Delaware has stressed that "the exacting standards of fiduciary

duties" must "not be extended" to ordinary business relationships.  *Wal-Mart Stores, Inc.*, 901

A.2d at 114.  In this case, Ulrich failed to produce evidence to prove that, during the relevant

period, he had a special trust relationship with O'Keefe, rather than an ordinary business

relationship.  Accordingly, Ulrich failed to establish liability because Ulrich failed to prove that

O'Keefe "owed [him] a fiduciary duty."  *Est. of Eller*, 31 A.3d at 897.

Even assuming, *arguendo*, that O'Keefe owed Ulrich a fiduciary duty, Ulrich failed to

prove any breach by O'Keefe.  Ulrich contends that O'Keefe breached a duty by negotiating a

favorable severance package for himself while failing to negotiate a favorable severance package

for Ulrich.  *See* Ulrich Aff. ¶ 31; Tr. at 57:5–14.  Specifically, Ulrich testified by affidavit that,

after the closing, he "learned from O'Keefe that Sheridan had 'required' O'Keefe to agree to a

severance package as a condition for final closing of the deal," but "O'Keefe [had] failed to obtain

a similar severance arrangement for [Ulrich]."  Ulrich Aff. ¶ 31.

There are multiple, fatal problems with Ulrich's account of O'Keefe's purported breach.

First, Ulrich's testimony that O'Keefe negotiated his own severance, while failing to negotiate a

severance for Ulrich, "as a condition" of the March 26, 2021 "closing" with Sheridan directly

contradicts Ulrich's position at trial that "the relevant time frame" for his claim was after "March

26th [2021], *after* the closing, to April 7th."  Ulrich Aff. ¶ 31; Tr. at 57:17–18 (emphasis added).

Ulrich presumably took the position that his claim arose "after the closing" because, as noted above and discussed below, in signing the Redemption Agreement, Ulrich released any and all claims against O'Keefe "arising out of any matter, thing, or event occurring up to and including the date of Closing . . . ." Tr. at 57:17–18; Redemption Agreement § 4(c). Thus, either Ulrich's principal evidence of O'Keefe's alleged breach—*i.e.*, the snippet of testimony in Ulrich's affidavit, quoted above—is gravely inaccurate, or, if the testimony is accurate, Ulrich released any claim against O'Keefe arising out of the alleged pre-closing severance negotiations.

Furthermore, while Ulrich attests that he "learned" of the alleged pre-closing severance negotiations "from O'Keefe," Ulrich Aff. ¶ 31, O'Keefe testified by affidavit that he was surprised by his termination and had "no opportunity" to "negotiate terms for either [himself] or Plaintiff," O'Keefe Aff. ¶¶ 17, 18, 23, 24. According to O'Keefe, he was "presented" with a severance offer "for the first (and only) time shortly after [he] was terminated," he "had no ability to negotiate," and he "accepted" the severance he was offered. O'Keefe Aff. ¶ 18. Ulrich did nothing to impeach O'Keefe's testimony that O'Keefe did not negotiate a severance offer for himself, which logically vitiates Ulrich's claim that O'Keefe breached a fiduciary duty by failing to negotiate "a similar severance arrangement for [Ulrich]." Ulrich Aff. ¶ 31; *see* Tr. at 72:1–2. Indeed, Ulrich's counsel declined to cross-examine O'Keefe at all. *See* Tr. at 72:1–2. Ulrich's flawed bit of testimony about O'Keefe's alleged pre-closing severance negotiations, which is directly contradicted by O'Keefe's unimpeached testimony, is obviously not enough to prove any breach of any fiduciary duty by a preponderance of the evidence.

Finally, Ulrich failed to prove his damages by a preponderance of the evidence, which he was required to do under Delaware law. *See In re TransCare Corp.*, 81 F.4th at 56. Ulrich sought damages reflecting the severance package that he believed he should have been offered. *See* Tr.

at 40:15–41:17. Specifically, Ulrich testified: "I felt that I was entitled to what John O'Keefe got." Tr. at 41:6–7. Ulrich, however, failed even to offer O'Keefe's severance agreement into evidence. More importantly, Ulrich failed to offer the Court any evidence to support a finding that Ulrich was "entitled" to an identical severance package. Tr. at 41:6.

To the contrary, all of the evidence in the record, including Ulrich's own evidence, reflects that O'Keefe was the sole founder of the original business, remained senior to Ulrich at all times, and had a much larger stake in every entity in which they both invested. O'Keefe alone founded NetGenIT. O'Keefe Aff. ¶ 1; *see* Ulrich Aff. ¶¶ 1–2; Tr. at 23:8–11. "Throughout [Ulrich's] employment, O'Keefe remained CEO," while Ulrich held various roles that reported to O'Keefe. Ulrich Aff. ¶ 10. Even after Ulrich "received a grant" of shares of NetGenIT from O'Keefe, O'Keefe "owned about three and a half times the amount of the company that [Ulrich] owned[.]" Ulrich Aff. ¶ 4; Tr. at 25:1–3. When asked why O'Keefe owned so much more of the company than he did, Ulrich testified, in substance, that his only "opportunity" to have equity in the business was to accept what O'Keefe "offer[ed]." Tr. at 25:5–7; *see also* O'Keefe Aff. ¶ 5. Before they were both terminated, O'Keefe was the CEO of ITelagen, with a salary of $325,000, and Ulrich was "Operations Coordinator," not an officer or director, and had a yearly salary of $100,000 per year. DX 14; Ulrich Aff. ¶ 36; *see* Tr. at 14:6. In light of this evidence, the Court has no basis to conclude that Ulrich was "entitled" to the same severance that O'Keefe received. Tr. at 41:6; *In re TransCare Corp.*, 81 F.4th at 56.

Furthermore, under Delaware law, "[a] party has a general duty to mitigate damages if it is feasible to do so." *Brzoska v. Olson*, 668 A.2d 1355, 1367 (Del. 1995). Ulrich, however, testified in his affidavit and on the stand that he was offered a severance package but refused to accept the

severance he was offered.  *See* Ulrich Aff. ¶ 34; Tr. at 40:6–8.  As such, Ulrich admitted that he failed to mitigate the damages he claims he incurred.

Accordingly, for all of the reasons set forth above, the Court concludes that Ulrich failed to prove his claim for breach of fiduciary duty.

**B.  O'Keefe Failed To Prove a Breach of the Release of Claims.**

O'Keefe alleges, in his counterclaim, that Ulrich breached the release of claims in the Redemption Agreement by filing this lawsuit.  *See* Ans. at 7; Redemption Agreement § 4(c).  O'Keefe seeks damages in the form of "attorney's fees and costs . . . arising from" the litigation.  Ans. at 7.  For evidence of the breach, the defense relied principally on O'Keefe's affidavit, the Redemption Agreement, and the parties' pleadings.  *See* Tr. at 71:10–72:19.

 "A release is a form of contract," and, therefore, a plaintiff asserting a breach of a release of claims must prove, by a preponderance of the evidence, the elements of a claim for breach of contract.  *E.I. DuPont de Nemours & Co. v. Fla. Evergreen Foliage*, 744 A.2d 457, 462 (Del. 1999).  Under Delaware law, "the plaintiff must demonstrate: first, the existence of the contract . . . ; second, the breach of an obligation imposed by that contract; and third, the resultant damage to the plaintiff."  *VLIW Tech., LLC v. Hewlett-Packard Co.*, 840 A.2d 606, 612 (Del. 2003).  To be sure, "Delaware law recognizes the validity of a general release."  *Adams v. Jankouskas*, 452 A.2d 148, 155 (Del. 1982).  To determine the scope of the obligations imposed by such a release (*i.e.*, what claims are barred), "the court will attempt to ascertain [the parties'] intent from the overall language of the document."  *Id.* at 156.

Here, by signing the Redemption Agreement, Ulrich released any and all claims against, *inter alia*, O'Keefe "arising out of any matter, thing, or event occurring ***up to and including the date of Closing***."  Redemption Agreement § 4(c) (emphasis added).  The date of the closing was

March 26, 2021. *See* O'Keefe Aff. ¶ 16. As discussed at length above, Ulrich maintained throughout the trial of this case this his claim was based only on events during the period after "March 26th [2021], *after* the closing, to April 7th." Tr. at 57:17–18 (emphasis added). O'Keefe has not provided proof to the contrary. Rather, in seeking "to dismiss [sic] the plaintiff's case-in-chief," the defense argued that the relevant period for any claim was immediately before the parties' "April of 2021" termination when "Mr. O'Keefe and Mr. Ulrich were employees." Tr. at 55:8–56:25. Indeed, the Court entered judgment on Ulrich's claim in favor of O'Keefe, pursuant to Rule 52(c), citing the "multiple" representations that "the relevant period for [Ulrich's] claim is the period [after] March 26th, 2021, through April 7th, 2021." Tr. at 64:17–19; *see id.* 64-66. As such, because the plain "language of the [Redemption Agreement]" releases only claims based on events "up to and including" March 26, 2021, the Court concludes that O'Keefe failed to prove that Ulrich breached the release of claims by bringing his claim for a breach of fiduciary duty based on alleged events *after* March 26, 2021 through April 7, 2021. *Adams*, 452 A.2d at 156; Redemption Agreement § 4(c); *see* Tr. at 57:17–18.

Accordingly, because the Court concludes that Ulrich is not liable for breach of contract, the Court will not accept supplemental submissions in connection with O'Keefe's alleged damages in the form of attorney's fees and costs.

## IV.    CONCLUSION

For the reasons set forth above, O'Keefe is entitled to judgment in his favor on the claim by Ulrich for breach of fiduciary duty, and Ulrich is entitled to judgment in his favor on the counterclaim by O'Keefe for breach of contract.

The Clerk of Court respectfully is requested to enter judgment and close this case.

**SO ORDERED.**

**Date:  August 12, 2025**
      **New York, NY**

**MARY KAY VYSKOCIL**
**United States District Judge**